# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF KENTUCKY
## CENTRAL DIVISION
### Electronically Filed

CIVIL ACTION NO.:  3:12-cv-00057-DCR

RALEIGH BRUNER, an individual, and WILDCAT MOVING, LLC, a Kentucky Limited Liability Company,                                    PLAINTIFFS,

v.          **PLAINTIFFS' AMENDED MEMORANDUM**
**IN SUPPORT OF PLAINTIFFS'**
**MOTION FOR SUMMARY JUDGMENT**

TOM ZAWACKI, Commissioner of Motor Vehicle Regulation for the Kentucky Department of Vehicle Regulation; MARTIN MATHEWS, Director for Motor Carriers of the Kentucky Transportation Cabinet Division of Motor Carriers; MARY COOK, Assistant Director of the Kentucky Transportation Cabinet Division of Motor Carriers; BRIAN BEAVEN, Assistant Director of the Kentucky Transportation Cabinet Division of Motor Carriers; and BILL DEBORD, officer of the Kentucky Transportation Cabinet Division of Motor Carriers; all in their official capacities,                DEFENDANTS.

**************************************************

## INTRODUCTION AND STATEMENT OF THE CASE

This lawsuit seeks to vindicate the constitutional right of Plaintiffs Raleigh ("RJ") Bruner and Wildcat Moving, LLC,[1] to earn a living as household goods movers in Kentucky without being subject to an arbitrary and irrational licensing law which gives existing moving companies the privilege of essentially blocking any potential competitor from obtaining a license to operate.

The statutes challenged here—KRS § 281.615 et seq., and their implementing regulations—establish a three-step process for obtaining the legally required Certificate of Public Convenience and Necessity ("Certificate" or "license") to operate a moving company in Kentucky.  When a person applies for a Certificate, the Transportation Cabinet Motor Carriers Division (Defendants or Division) must **first** review the application to ensure that the applicant is "fit, willing and able to properly perform the service proposed"—that is, that the proposed business complies with public health, safety, and welfare considerations.  KRS § 281.630; Exhibit 121 at PLF1597;[2] Ex. 141 at PLF1774; Ex. 139 at PLF1760.  Bruner does not challenge this requirement.

The **second** and **third** steps, however, establish arbitrary, irrational, and unconstitutional standards.  Together, they essentially allow existing moving companies to veto their own potential competition, preventing newcomers from

---

[1] Hereafter collectively referred to as "Bruner" unless otherwise specified.

[2] Plaintiffs have added these Bates Stamp numbers to some of the Exhibits for the Court's convenience.

getting Certificates for reasons totally unrelated to public health, safety, and welfare. This "Competitor's Veto" is not rationally related to protecting the public, but only protects a discrete interest group against legitimate competition. *Cf. Craigmiles v. Giles*, 312 F.3d 220, 224 (6th Cir. 2002) ("protecting a discrete interest group from economic competition is not a legitimate governmental purpose.").

The **second** step requires an applicant to prove that "existing transportation service is inadequate," and that a new moving company would serve the "present or future public convenience and necessity." KRS § 281.630(1). No statute, regulation, case law, or other legal source defines these terms, nor is there any handbook or other standard guideline which the Division employs when applying these standards. Ex. 7 No. 18; Ex. 9; Ex. 2 at 20:1 - 21:20. Defendants admit that they do not employ any objective criteria when making this determination. Ex. 2 at 13:19-25, 16:18-24, 18:1-4. These terms have no fixed meaning, and are unintelligible and undefined, so that persons of ordinary intelligence would necessarily have to guess as to their meaning. Moreover, the "inadequacy" requirement inherently biases the Division's licensing decisions by presuming that existing services are adequate unless (somehow) proven otherwise—thus privileging existing firms against potential competition for reasons unrelated to the applicant's "fitness or capacity to practice" the moving trade. *Schware v. Bd. of Exam'rs*, 353 U.S. 232, 239 (1957). Rather than protecting the public against unsafe or incompetent movers, this provision perpetuates a cartel in the moving industry that violates Bruner's constitutional right to engage in the trade of his choice. *Cf. New State Ice Co. v. Liebmann*, 285 U.S.

262, 278-79 (1932).

The **third** requirement strengthens this Competitor's Veto by inviting existing moving firms to file "Protests" against applicants. Applicants are required to notify all existing Certificate holders who are then given the opportunity to object, whereupon the Division must convene a hearing at which the applicant must prove the "inadequacy" and "present or future public convenience and necessity" requirements. This Protest and hearing procedure can be expensive and slow—and thus a severe burden on small, start-up businesses. Worse, the Division has rejected *every* Protested application in the last five years—always finding that existing services are not "inadequate." The Division has never rejected an applicant on public health or safety grounds, and no Protestant has ever alleged or proven that an applicant was a threat to public health, safety, or welfare. Instead, Protestants virtually always object on the grounds that a new firm would compete economically against them. Applicants, doubtless aware that Protested applications for new Certificates are always rejected, typically abandon or withdraw their applications as soon as a Protest is filed, and file new applications for permission to buy Certificates from existing firms. The latter type of application is never Protested or denied. Ex. 8 Nos. 10-13; Exhibits 60, 61, 62, 63, 67, 68, 139, 140, and 141. The Division has even denied a *new* Certificate in a Protested case on the grounds that existing services were not "inadequate," only to then turn around soon after and grant the same applicant permission to *buy* a Certificate from an existing firm, on the grounds that existing moving services were "inadequate." Exhibits 12, 120, and 121.

Bruner contends that the Competitor's Veto deprives him of his constitutionally protected "right to compete," *Wilkerson v. Johnson*, 699 F.2d 325, 238 (6th Cir. 1985), and "to follow a chosen profession free from unreasonable governmental interference," *Greene v. McElroy*, 360 U.S. 474, 492 (1959). The **only** role of the Competitor's Veto is to preserve existing movers' market share against potential competition. This "naked attempt to raise a fortress protecting the monopoly rents that [established moving companies] extract from consumers" violates the Fourteenth Amendment. *Craigmiles*, 312 F.3d at 229; *accord*, *Merrifield v. Lockyer*, 547 F.3d 978, 991 (9th Cir. 2008) (licensing law "designed to favor economically certain constituents at the expense of others similarly situated" is unconstitutional).

## ARGUMENT

## I

## STANDARD OF REVIEW

Summary judgment should be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323-34 (1986). To prevail, Bruner must demonstrate the absence of a genuine dispute of material fact. *Id.* at 323. The burden then shifts to the nonmoving party to show that there is a dispute for trial. *Id.* The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S.

574, 586 (1986), but must identify specific facts in evidentiary materials revealing a genuine issue for trial. *Celotex*, 477 U.S. at 323. The issue here—whether the Competitor's Veto is constitutional—is appropriate for summary judgment.

## II

## THE RATIONAL BASIS
## STANDARD AND PROTECTIONISM

When a law regulating economic activities is challenged under the Fourteenth Amendment, courts employ the rational basis test, under which laws must be rationally related to a legitimate state interest. *Craigmiles*, 312 F.3d at 224; *Merrifield*, 547 F.3d at 991-92. This test is lenient, but not "toothless," *Mathews v. Lucas*, 427 U.S. 495, 510 (1967), and a law that does not "rationally [advance] a reasonable and identifiable governmental objective" fails this test. *Schweiker v. Wilson*, 450 U.S. 221, 235 (1981). More specifically, a licensing law that restricts entry into a trade or profession is unconstitutional if it is not rationally related to the applicant's "fitness or capacity to practice" that trade or profession. *Schware*, 353 U.S. at 239. Likewise, a licensing law fails the rational basis test if its only purpose is to protect the private interests of established businesses against legitimate competition. *Craigmiles*, 312 F.3d at 226.

*Craigmiles* provides a roadmap for deciding this case. There, the court first examined a Tennessee occupational licensing requirement to determine whether it was rationally related to the state's legitimate interest in protecting public health, safety, or welfare. When it found that the requirements bore no realistic connection

to these interests, the court proceeded to determine whether, instead, the licensing restriction unconstitutionally protected established firms against legitimate competition. *See id.* at 224-28 ("Finding no rational relationship to any of the articulated purposes of the state, we are left with [its] more obvious illegitimate purpose," namely "protecting a discrete interest group from economic competition."). *See also Wilkerson*, 699 F.2d at 238 (government may not use licensing laws to prohibit competition for private purposes).

To prevail, Bruner must show (1) that he is legally deprived of a protected liberty interest unless he submits to the Competitor's Veto, (2) that any relationship between that requirement and public health, safety, morals, or general welfare is "so attenuated as to render [it] arbitrary or irrational," *Bannum, Inc. v. City of Louisville*, 958 F.2d 1354, 1361 (6th Cir. 1992), and (3) that the challenged law merely protects established firms against legitimate competition. *Craigmiles*, 312 F.3d at 228. None of the facts in this case are contested. The undisputed evidence conclusively shows that the Competitor's Veto lacks any rational relationship to a legitimate government interest, and only serves the unconstitutional purpose of limiting Bruner's liberty so as to prevent economic competition. Bruner is entitled to summary judgment.

## III

## BRUNER'S MOVING BUSINESS

Raleigh Bruner started Wildcat Moving in 2010, after obtaining a Masters in Business Administration from the University of Kentucky. Declaration of Raleigh Bruner (Bruner Dec.) (Docket No. 54) ¶¶ 2, 3. In four years of operation, Bruner has

helped more than 5,000 clients, with a clean safety record and a consistent record of customer satisfaction. *Id.* ¶¶ 4, 5, 8. He was unaware when he founded Wildcat Moving that full service moving companies are required to have a Certificate. *Id.* ¶ 6. On May 21, 2011, Bruner and Wildcat Moving received a letter from the Division stating that Wildcat Moving was operating without a certificate and threatening fines and jail time for operating without a Certificate. *Id.* Bruner and Wildcat Moving do not currently hold a Certificate, and are not legally authorized to operate as a full-service moving company, but are otherwise ready, willing, and able to do so. *Id.* ¶ 10.

## IV

## HOW THE COMPETITOR'S VETO LAW WORKS

### A.  The Competitor's Veto On Its Face

To operate a full-service household goods moving company in Kentucky requires a Certificate. KRS § 281.615. Operating without a Certificate is punishable by fines and is a criminal violation. KRS §§ 281.990(2); 532.020(4); 431.060(3); Ex. 6 at 74:22-24. Section 281.630(1) of the Kentucky Revised Statutes and 601 Ky. Admin. Regs. 1:030 establish **criteria** for obtaining a Certificate and a **procedure** for an applicant who wants a Certificate.

There are four **criteria**:  the applicant must be (a) "fit, willing, and able" to perform the proposed moving service and comply with the law; (b) "existing transportation service" must be shown to be "inadequate"; (c) the proposed moving company "is or will be required by the present or future public convenience and necessity"; and (d) the proposed moving company must be "consistent with the

- 7 -

public interest."  KRS § 281.630(1).

The **procedure** is as follows:

(A) A person must submit an application, which the Division checks over for accuracy and completeness.  KRS § 281.620; Ex. 2 at 19:4-18.  Once it is complete, the Division must schedule a hearing to review the application and determine whether to grant the Certificate.  Ex. 1 at 21:12 - 22:6.

(B) Simultaneously with submitting the application, the applicant must notify existing licensed moving companies, either by newspaper or by email, of his intention to apply for a Certificate.  KRS § 281.6251(1).  If the applicant uses email, he is *only* required to notify existing moving companies.  KRS § 281.6251(1)(b).  These existing companies are then given the opportunity to file Protests against the application.  KRS § 281.625(2).  Protests need not be sworn or notarized, and need not contain any factual information or allegations regarding public health, safety, or welfare.  601 Ky. Admin. Regs. 1:030(4)(1)(d).  The Division does not investigate or examine Protests to ensure that they meet any standards of acceptability, Ex. 3 at 22:3-23, and no Protest has ever been rejected by the Division for incompleteness or other reasons.  Ex. 2 at 26:9-16.  Whenever a Protest is filed, the Protestant may participate in the hearing.  601 Ky. Admin. Regs. 1:030(4), (6).

Going through a hearing severely burdens an applicant.  First, it constitutes a significant delay; it can take up to a year for a Protested application to go through a hearing, Ex. 2 at 30:14-15, and can take months for the Division to issue a formal decision after the hearing ends.  Second, hearings are expensive, especially

because a corporation or an LLC like Wildcat Moving must be represented by a licensed attorney.  *See Ky. State Bar Ass'n v. Henry Vogt Machine Co., Inc.*, 416 S.W.2d 727 (Ky. 1967); Ex. 7 No. 22.  Third, even if there is no indication that a proposed moving service poses any public health, safety, or welfare concern, an applicant must be denied a Certificate if the hearing officer concludes that existing service is "adequate."  (In fact, the risk of denial at the end of a hearing is 100 percent, since *all Protested applications since 2007—except those abandoned by the applicant—have been denied.*  Ex. 8 Nos. 5-8.)

An applicant must prove at that hearing that existing moving services are "inadequate" and that granting the Certificate would be consistent with "the present or future public convenience and necessity."  KRS § 281.630(1).[3]  These phrases are not defined in any statute, regulation, or case law in Kentucky.  The Division does not maintain any handbook or other written guideline that defines these terms, and does not apply any objective criteria when determining whether existing moving services are inadequate or whether a new moving company would serve the "future public convenience."  Ex. 2 at 13:19-24, 16:18-24, 18:1-4; Ex. 7 No. 18; Ex. 2 at 20:1-20; Ex. 9.  These statutory standards are vague and incomprehensible, and inherently protect established firms against competition from the applicant regardless of the applicant's fitness, skill, qualifications, ability, or safety record.  Under these

---

[3] If no Protest is filed, the Division may cancel the hearing, but in that case, the applicant must still prove to the Division that there is "a need for the service" as well as meeting the "fit, willing, and able" standards."  601 Ky. Admin. Regs. 1:031(1). No controlling legal authority, or handbook or guideline, define "a need."

standards the Division presumes against an applicant, and may deny the application for reasons unrelated to the applicant's fitness or capacity to practice the moving trade.  KRS § 281.625(1); Ex. 1 at 60:9-12.

Taken together, KRS § 281.630(1) and 601 Ky. Admin. Regs. 1:030 create a Competitor's Veto under which the Division can—and regularly does—block potential competition in the moving industry not for reasons related to protecting the public health, safety, or welfare, but instead to protect the market position of existing firms.  The Competitor's Veto "imposes a significant barrier to competition in the [moving] market," *Craigmiles*, 312 F.3d at 228, which "protect[s] licensed [movers] from competition . . . harms consumers in their pocketbooks," *id.*, and deprives Bruner of "the right to compete."  *Wilkerson*, 699 F.2d at 238.

## B.  The Competitor's Veto as Applied

Since 2007,[4] there have been 39 applications for new household goods moving Certificates.  *See* Exhibits 10, 13, 20, 24, 27, 30, 33, 36, 39, 42, 45, 48, 51, 53, 55, 57, 60, 64, 67, 69, 72, 74, 76, 78, 80, 82, 84, 86, 88, 90, 92, 94, 96, 98, 100, 102, 149, 151, and 160.  Some are still pending.  Of those that have been decided, 19 were Protested by one or more existing moving companies, for a total of 114 Protests filed between January 1, 2012, and August 21, 2012.  *See* Exhibits 14, 15, 21, 25, 28, 31, 37, 40, 46,49, 52, 54, 58, 61, 62, 68, 70, 152, 158, 159, and 161.  All

---

[4] Bruner confined his discovery requests to the period between Jan. 1, 2007 and the filing of this lawsuit simply to limit discovery within manageable boundaries.  He is aware of no facts which would suggest that the Competitor's Veto operated in a different way at any previous time period.

114 Protests were filed by existing moving firms.  Not a single one alleged, proved, or stated any concerns about the public health, safety, or welfare consequences if the application in question were granted.  All Protested explicitly on the grounds that a new moving firm would "directly compet[e] with . . . the[] protestant[] and . . . result in a diminution of protestant['s] revenues."

No Protest has ever been filed by a member of the general public.  Ex. 7 No. 20.  Indeed, although applicants must publish a notice of intent to apply for a Certificate, the law only requires them to notify *existing movers* of that intent—they are not required to inform the general public at all.  KRS § 281.6251(1)(b).  Thus the consuming public plays no necessary role in the application process.

No Protestant has ever provided the Division with any facts relating to an applicant's public safety record, experience, honesty, skills, or any other matter relating to public health, safety, or welfare.  Ex. 2 at 54:24 - 55:17; Ex. 1 at 60:13 - 61:1; Exhibits 14, 15, 21, 25, 28, 31, 37, 40, 46, 49, 52, 54, 58, 61, 62, 68, 70, 152, 158, 159, and 161.  The Division does not examine Protests to determine whether they state any facts or allegations relating to public safety; they accept any and all Protests that are filed.  Ex. 3 at 22:3-23.  Since 2007, the Division has never rejected a Certificate application on the basis of public health or safety considerations; all rejections have been on the basis that existing services were not "inadequate." Ex. 12 at PLF1455-56; Ex. 23 at PLF1617; Ex. 18 at PLF1791; Ex. 2 at 55:18 - 56:2.

Unsurprisingly, of the 19 Protested applications since 2007, 16 chose either to abandon or to withdraw their applications rather than to pursue the application

process to its conclusion.  Ex. 8 Nos. 6, 7; Ex. 2 at 47:2-7; Ex. 59.[5]  Those who have persisted and gone through a hearing to defend their Protested applications have always been denied.  Ex. 8 No. 9.

For example, Michael Ball had been in the moving business for 35 years when he decided to apply for a new Certificate in his own name.  Ex. 13; Ex. 18 at PLF1785-90.  He suffered six Protests.  Exhibits 14 and 15.  None identified any public safety or welfare concerns, but all complained that Ball's company would be "directly competitive with" the Protestants' operations and "result in a diminution of protestants' revenues."  Ex. 14 at PLF0110.  Ball participated in a hearing.  Ex. 17. No testimony or other evidence at that hearing suggested that Ball was unqualified, or that his operation would endanger the public health or safety or the environment or public infrastructure.[6]  *Id.*  The hearing officer concluded that Ball was "fit, willing, and able to perform the proposed service and to conform to" the law, Ex. 18 at PLF1790; Ex. 8 No. 16, and remarked on his extensive experience in the moving business.  Ex. 18 at PLF1785-90.  Yet the Division rejected Ball's application on the grounds that Ball had "not prove[n] that the existing household goods moving service in Louisville is inadequate and that his proposed service is needed."  Ex. 8 No. 17; Ex. 18 at PLF1791; Ex. 19.  The only bases for the conclusion that existing services

---

[5] In addition to the fifteen abandoned applications identified by the Defendants, a sixteenth, Theodore Hodges, failed to attend his hearing and was deemed to have abandoned his application.  Ex. 59.

[6] On the contrary, one Protestant testified that he "believe[d] that [the] applicant Mr. Michael Ball, would be a great mover."  Ex. 18 at PLF1788.

were adequate were assertions to that effect by existing moving companies.  Ball was denied a Certificate solely because he would compete against them.

Likewise, when Larry Coyle, dba Madison Movers, applied for a Certificate, he suffered a Protest from Sexton & Sons Moving & Storage.  Exhibits 20 and 21.  The Division convened a hearing.  Again the Division heard no evidence that Coyle was unsafe or unqualified and concluded that "[t]he applicant . . . is fit, willing, and able."  Ex. 23 at PLF1616; Ex. 8 No. 14.  Yet the hearing officer recommended denying the application because Coyle had not proven that existing services were inadequate.  Indeed, the hearing officer concluded that "granting additional service would be unfair and destructive to the [existing] companies."  The Division denied him a Certificate for that reason.  Ex. 23 at PLF1617, PLF1620-21; Ex. 8 No. 15.

And when Margaret's Moving & Storage applied for a Certificate, Ex. 10, it suffered Protests from eight moving companies, who complained that Margaret's would compete against them.  Ex. 11.  For example, one Protestant, Arrow Moving, testified at the subsequent hearing that "customers [had] call[ed] him and [told] him that they were going to move with Arrow, but they decided to move with applicant/Margaret's Movers because applicant was cheaper."  Ex. 12 at PLF1452.  Competition was Arrow's sole basis for Protesting.  No Protestant claimed that Margaret's was dangerous, unqualified, or unskilled—indeed, one acknowledged that he "did not complain about [Margaret's] quality of work or ability to do [its] job."  *Id.*  Yet the hearing officer recommended denying Margaret's a Certificate because

it had not proven that existing services were inadequate.  Ex. 12 at PLF1456.[7]

As these facts indicate, the Competitor's Veto blocks potential new moving companies not because they are unqualified, unskilled, inexperienced, or a danger to the public, but simply because existing moving services do not want competition. If incumbent firms Protest against an application, the Division invariably concludes that existing moving services are "adequate"[8] and rejects the application regardless of the applicant's "fitness or capacity to practice" the moving trade.  *Cf. Schware*, 353 U.S. at 239.

## C. How Transfer Applications Differ from Applications for New Certificates

The nature of the Competitor's Veto process is made even clearer by contrasting applications for *new* Certificates with applications for *transfer of an existing* Certificate—*i.e.*, permission to buy a Certificate from an existing moving company.  Although the same laws apply to transfer applications and to applications for new Certificates, KRS §§ 281.625(1)(a); 281.630(8), *transfer* applications do not create new competition with existing moving companies.  As a result, no application

---

[7] Margaret's was also denied a Certificate on the grounds that it had operated illegally in the past, and was therefore not "fit, willing, and able."  Ex. 12 at PLF1455. But only 17 months later, when Margaret's sought permission to buy a Certificate from another moving company, the Division found that Margaret's *was* "fit, willing, and able," in part because Margaret's "[had] been in the moving industry for over ten (10) years."  Ex. 121 at PLF1596-97.

[8] In cases in which *unprotested* applications have been granted, the Division has typically concluded that the absence of a Protest is proof that existing services are "inadequate."  Ex. 73 at PLF1390; Ex. 75 at PLF1414; Ex. 79 at PLF1483; Ex. 81 at PLF1506; Ex. 83 at PLF1542; Ex. 87 at PLF1589; Ex. 89 at PLF1606; Ex. 91 at PLF1631; Ex. 93 at PLF1741; Ex. 95 at PLF1661; Ex. 97 at PLF2171; Ex. 111 at PLF1406-07; Ex. 113 at PLF1468-69; Ex. 157 at PLF1459.

for the *transfer* of an *existing* Certificate has ever been Protested, Ex. 8 No. 10, and none has ever been denied.  Ex. 8 No. 11.

Remarkably, in at least three cases, applicants who initially applied for new Certificates, suffered objections, and either had their applications denied or chose to withdraw their applications, later bought a Certificate from a company that had Protested against its original application!  For example, when Little Guys Movers applied for a new Certificate in March, 2012, eight existing moving companies Protested, Exhibits 67 and 68, including Affordable Moving, Inc.  Ex. 68 at PLF0107. Little Guys abandoned its application, Ex. 8 No. 12, but five months later, applied for permission to buy a Certificate, Ex. 140, and that application was approved a month later without Protest.  Ex. 141; Ex. 8 Nos. 11, 13.  The company that sold Little Guys a Certificate was Affordable Moving, Inc.  Ex. 141 at PLF1775.  And when Big O Movers applied for a new Certificate in January, 2011, its application was Protested by, among others, Rivertown Moving & Storage.  Exhibits 60, 61, 62.  Big O Movers withdrew its application, Ex. 63, and filed a new application for permission to buy an existing Certificate—from Rivertown Moving & Storage.  Ex. 139.  No Protests were filed, and the Division granted the application.  *Id.*  At no time during the process did considerations of public health or safety enter into the Division's decision-making.

Even applicants who were denied *new* Certificates on the basis of *illegal activity* have been allowed to *buy existing* Certificates later and open up business. For example, as noted above, when Margaret's Movers applied for a new Certificate, its application was Protested by eight firms, Ex. 11, and in September, 2008, the

- 15 -

Division denied Margaret's a license in part because it had operated without a Certificate in the past, thus proving that it was not "fit, willing, and able."  Ex. 12 at PLF1455.  The Division also found that existing moving services were "adequate." Ex. 12 at PLF1456.  One of the firms Protesting against Margaret's was J.D. Taylor. Ex. 11 at PLF0070.  Only 17 months later, in November, 2009, Margaret's filed a new application, this time for authority to buy an existing Certificate.  Ex. 120.  The company that sold Margaret's the Certificate was J.D. Taylor.  Ex. 121 at PLF1599. This time, Margaret's application was *not* Protested, and the Division—which had recently ruled that Margaret's was not "fit, willing, and able," because it had operated without a Certificate for a number of months, Ex. 12 at PLF1455—now concluded that Margaret's *was* "fit, willing, and able," and astonishingly cited as grounds for that conclusion the fact that Margaret's "[had] been in the moving industry for over ten (10) years"!   Ex. 121 at PLF1596-97.   This difference in treatment between Margaret's September, 2008, application for a new Certificate and its November, 2009, application to buy a Certificate from an existing firm can be explained by the Division's conclusion that letting Margaret's buy an existing Certificate "will not adversely affect the operations of any other existing carriers."  Ex. 121 at PLF1597.

## D.  When Applicants Defend Themselves

The cartel character of the Competitor's Veto is made even clearer when one considers the (still pending) application of MJ, LLC, dba College Hunks Moving. When MJ applied for a Certificate, that application was Protested by seven existing movers, who as usual stated that the grounds for their objection was that MJ would

"directly compet[e] with . . . these protestants and will result in a diminution of protestants' revenues."  Exhibits 160, 161.  The Division scheduled a hearing. Ex. 162.  Unlike most applicants, MJ responded on January 9, 2013, by serving the Protestants with Interrogatories and Document Production Requests.  Ex. 163. Almost immediately, three Protestants withdrew their Protests.  Ex. 164.  Another admitted in an Interrogatory Response that it "would have no interest in protesting any application which was not requesting a certificate for household goods authority . . . in Lexington or a nearby city."  Ex. 165 at PLF2249.  And when MJ persisted with followup interrogatories on April 11, two of the remaining Protestants withdrew their Protests eight days later.  Exhibits 166 and 167.  This behavior is not consistent with the theory that Protestants participate in the process to prevent dangerous or dishonest moving companies from entering the market.  On the contrary, it demonstrates again that Protests have the sole purpose of burdening would-be moving companies and preventing economic competition.

V

## THE COMPETITOR'S VETO PROCEDURE VIOLATES THE DUE PROCESS AND EQUAL PROTECTION CLAUSES BOTH FACIALLY AND AS APPLIED

### A.  Bruner Does Not Challenge the Constitutionality of Any Law That Protects the General Public

To be absolutely clear, Bruner does not challenge the constitutionality of the "fit, willing, and able" requirement in KRS § 281.630, or any other statute that requires movers in Kentucky to operate in a safe and responsible manner.  He does

not challenge any requirement that moving companies be insured, maintain their vehicles properly, obey traffic laws, or refrain from damaging or stealing property. Although no Kentucky statute, regulation, or caselaw defines the phrase "fit, willing, and able," the phrase is common in transportation regulations, where it typically refers to proof that the business will conform to public health and safety regulations. *See*, *e.g.*, *Braniff Airways v. Civil Aeronautics Bd.*, 147 F.2d 152, 153 (D.C. Cir. 1945); 49 CFR § 365.107(a) (defining fitness as "compliance with applicable financial responsibility and safety fitness requirements."). Bruner does not challenge this statutory provision.

## B. Allowing Existing Firms to Protest Without Any Consideration of Public Health, Safety, and Welfare, Is Facially Unconstitutional

Every person has a constitutional right to earn a living without unreasonable government interference. *Greene v. McElroy*, 360 U.S. 474, 492 (1959). The state may not arbitrarily restrict a person's "free choice of careers and occupations . . . [or] the right to compete." *Wilkerson*, 699 F.2d at 328. While states have broad discretion to regulate businesses and impose licensing and testing requirements to protect the public, any such conditions must rationally relate to a person's "fitness and capacity to practice" the trade in question, *Schware*, 353 U.S. at 239, and may not be devised simply to protect established firms against legitimate competition. *Craigmiles*, 312 F.3d at 224.

The time-consuming, costly Competitor's Veto procedure challenged here is unconstitutional because it imposes a severe burden on Bruner's ability to obtain a

Certificate and engage in the moving trade, without any rational connection to his skills and experience, or any other public health or safety consideration—but solely to protect established movers against competition.

Allowing existing moving companies to Protest the issuance of a Certificate so as to preserve their market share against potential competition does not protect public health, safety, or welfare.  *See New State Ice Co.*, 285 U.S. at 278-79; *Craigmiles*, 312 F.3d at 229.  Protestants are not required to offer—and no Protestant ever has offered—any facts or opinions about an applicant's safety record, or the possible public health or welfare consequences of granting a new Certificate in order to invoke the hearing requirement.  KRS § 281.625(2); 601 Ky. Admin. Regs. 1:030(4)(1).  Nor does the statute include any criteria by which valid Protests can be distinguished from invalid ones; the filing of a Protest is alone sufficient to impose the expensive and time-consuming hearing requirement on an applicant, and the Division has never refused to accept a Protest.  Ex. 3 at 22:3-23.  Thus even an applicant with a perfect safety record can be forced to undergo a hearing for reasons unrelated to the applicant's qualifications.

As Bruner's expert witness, Dr. Adrian Moore, testified, the Competitor's Veto process restricts competition, raises prices, limits choices for consumers, and tends to reduce service quality.  Declaration of Dr. Adrian Moore (Moore Dec.) (Docket No. 55) ¶¶ 6-8.  Existing moving firms, given the opportunity to prevent newcomers from entering the market, will tend to exploit the licensing mechanism for private benefit.  Their Protests will tend to be biased by their self-interest in reducing

competition.  *Id.* ¶ 15.  The record unequivocally demonstrates the reality of this phenomenon. Limiting competition against incumbent firms whenever they assert that they provide "adequate" service reduces the competitive pressures that lowers prices and keeps the moving industry dynamic. *Id.* ¶¶ 14, 16, 18, 20.  As Dr. Moore attested, the Competitor's Veto procedure is anti-competitive, harms consumers, and serves no public interest in consumer protection or fair competition.  *Id.* ¶¶ 5-8, 11-12, 14-16, 18; Ex. 5 at 72:2-12.

Defendants' expert witness[9] suggested that the Competitor's Veto procedure is meant to prevent the alleged danger of "excess entry" into the moving industry, Ex. 4 at 2, as well as to address the problem of "information asymmetry."  *Id.* at 3. But "excess entry" can occur only in markets with high start-up costs and homogenous goods or services (such as the electricity industry[10]), Moore Dec. ¶ 16; Ex. 4 at 2, and the moving industry has *low* start-up costs and *heterogenous* services.  Moore Dec. ¶ 16; Ex. 5 at 72:2-12.  Nor is there any empirical evidence

---

[9] Defendants' expert had not read any of the documents produced in discovery. Ex. 5 at 9:25 - 10:13.  He testified that he has never done research, never published anything, never taught, and never testified, on matters relating to occupational licensing, transportation markets, or transportation regulation. Ex. 5 at 8:9-23, 11:24 - 12:5, 72:13 - 74:6.  He would not call himself an expert on the household goods moving industry or occupational licensing laws.  Ex. 5 at 73:7 - 74:2.  By contrast, Plaintiffs' expert witness has extensive expertise in the field of transportation regulation, having done empirical research and published extensively on the economics of licensing taxicabs and moving companies, and having extensive expertise in the field of public choice theory.  Ex. 1 to Moore Dec.

[10] Even in these industries, the rationalization for entry restrictions like the Competitor's Veto is dubious.  *See* Richard A. Posner, *Natural Monopoly and Its Regulation*, 21 Stan. L. Rev. 548, 611-12 (1969) ("the fear of ruinous competition seems largely groundless . . . .  [T]here is now a good deal of evidence that the certificating power has been used to limit greatly the growth of competition in the regulated industries.").

that "excess entry" occurs in any market, including even those in which it can theoretically occur. Moore Dec. ¶ 16.

There is no evidence that the "excess entry" theory is part of the Competitor's Veto process. No statute or regulation requires the Division to determine whether entry is "excessive" or whether any "business stealing" is occurring. Nor do Defendants investigate the cost of moving services in the marketplace; nor has the concept of "excess entry" ever been referred to in any hearing application in the record. Ex. 1 at 31:5-18; Ex. 2 at 32:11-13. On the contrary, neither the Division's chief, Defendant Tom Zawacki, nor General Counsel Jesse Rowe,[11] had ever heard of the term "excess entry" before, and both admitted that the Division never takes such factors into consideration. Ex. 1 at 31:5-18; Ex. 2 at 32:11-13.

The Competitor's Veto also is not rationally related to the problem of "information asymmetry." Information asymmetry is resolved by making information symmetrical—for example, by requiring the disclosure of information to consumers.[12] The Competitor's Veto does not do this, and the Division's consideration of applications for Certificates has no connection to information asymmetry considerations. The Division's expert witness claimed that the Competitor's Veto could resolve information asymmetry via the requirement that applicants notify the

---

[11] Mr. Rowe was identified by Defendants as the "person most knowledgeable" pursuant to Fed. R. Civ. P. 30(b)(6), and therefore testified on behalf of the Division as a whole.

[12] See Stephen M. Bainbridge, Mandatory Disclosure: A Behavioral Analysis, 68 U. Cin. L. Rev. 1023, 1032-34 (2000).

public of the intent to apply for Certificates, Ex. 4 at 3, but in fact the statute *does not* require an applicant to notify the general public; KRS § 281.6251(1) is phrased in the disjunctive, and only *requires* the applicant to notify *existing movers*, not the public.

The Division also suggested that the Competitor's Veto allows the Division to obtain information about an applicant's skills or reputation that might be known to other movers.  But there is no requirement that a Protestant offer any such information; a Protest need not state any facts or allegations about an applicant's record, skills, reputation, etc.  601 Ky. Admin. Regs. 1:030(4)(1)(d).

Even if there were grounds for thinking that "excess entry," information asymmetry, or the investigation of an applicant's reputation were the purposes of the Competitor's Veto, such considerations are not rationally related to a mechanism that only invites existing firms—and *not* members of the general public—to participate.  There is an obvious conflict of interest in allowing existing firms to burden or bar their own competition.  *Cf. New State Ice*, 285 U.S. at 278-79.  Yet the Division never assesses a Protest to ensure that it focuses on public considerations or economic factors; a Protest need not state any facts at all to be accepted by the Division and to trigger the hearing requirement.  601 Ky. Admin. Regs. 1:030(4)(1)(d).  This conflict of interest is enough to unmask the statute for what it is:  an effort to protect a discrete interest group against economic competition.  As the Fifth Circuit recently noted, "[t]he great deference due state economic regulation does not demand judicial blindness to the history of a challenged rule or the context of its adoption nor does it require courts to accept nonsensical explanations for

regulation." *St. Joseph Abbey v. Castille*, 712 F.3d 215, 226 (5th Cir. 2013).

In *New State Ice*, 285 U.S. at 278-79, the Supreme Court struck down an Oklahoma law that required a Certificate to operate an ice-delivery business. The Court found that while in some markets, restrictions of this sort might be rational, they were unconstitutional in an ordinary, competitive industry. *Id.* "Stated succinctly, a private corporation here seeks to prevent a competitor from entering the business," the Court said.

> There is no question now before us of any regulation by the state to protect the consuming public either with respect to conditions of manufacture and distribution or to insure purity of product or to prevent extortion. The control here asserted does not protect against monopoly, but tends to foster it. The aim is not to encourage competition, but to prevent it; not to regulate the business, but to preclude persons from engaging in it. There is no difference in principle between this case and the attempt of the dairyman under state authority to prevent another from keeping cows and selling milk on the ground that there are enough dairymen in the business; or to prevent a shoemaker from making or selling shoes because shoemakers already in that occupation can make and sell all the shoes that are needed.

*Id. See also Buck v. Kuykendall*, 267 U.S. 307, 315-16 (1925) (striking down Certificate requirement as monopolistic because "[i]ts primary purpose is not regulation with a view to safety or to conservation of the highways, but the prohibition of competition."). The same is true here. The Competitor's Veto does not aim to prevent public harms, but solely to prevent a new moving company—regardless of skill or quality—from entering the trade.

**C. The Protest and Hearing Procedure
Is Unconstitutional as Applied**

Even if the Competitor's Veto were facially constitutional, the record

demonstrates that, as applied, it only bars entry into the moving business and does

not rationally relate to a legitimate government interest.

Although the Division suggested that the Protest procedure allows existing

firms to bring to the Division's attention facts about an applicant's reputation or skills

that the Division might not otherwise know, the record demonstrates that there is no

rational foundation for believing this ever happens.  All Protests in the record were

filed by existing firms, not members of the general public.  Ex. 7 No. 20.  Second, all

Protests declared explicitly that they were objecting to new competition. *See* Exhibits

14, 15, 21, 25, 28, 31, 37, 40, 46, 49, 52, 54, 58, 61, 62, 68, 70, 152, 158, 159, and

161.  No Protestant has ever provided the Division with information relating to public

health or safety, or information about the applicant's accident or consumer complaint

record.  *See* Exhibits 14, 15, 21, 25, 28, 31, 37, 40, 46, 49, 52, 54, 58, 61, 62, 68,

70, 152, 158, 159, 161, and Ex. 1 at 60:13-61:1.  In no case between January 1,

2007, and the filing of this case did a hearing officer receive evidence from a

Protestant that showed that the applicant was unsafe or unqualified.  Exhibits 12, 17,

22.  Nor was any application denied for public safety reasons, or considerations of

public health, or threats to public infrastructure, or other legitimate government

interests.  Ex. 12 at PLF1455-56; Ex. 23 at PLF1617; Ex. 18 at PLF1791; Ex. 2

at 55:18-56:2.  Instead, all denials were based on the Division's conclusion that the

existing moving companies who Protested against the applicant were already "adequate."[13]  Ex. 18 at PLF1791; Ex. 23 at PLF1617; Ex. 12 at PLF1456.

On the other hand, applications for the transfer of an existing Certificate are never Protested.  Ex. 8 No. 10.  And when Protested applicants give up seeking new Certificates, and instead ask to buy an existing Certificate from an established firm, such applications are invariably granted without objection, even where—as with Margaret's Moving, Little Guys, and Big O Movers—the applicant had previously suffered Protests.  The only difference between new Certificate applications and transfer applications is that transfer applications do not present the same competitive threat to existing firms as new Certificates do.

In short, public health and safety plays no role in the Division's determination of "inadequacy" or "present or future public convenience and necessity."

**D.  The "Inadequacy" Requirement on Its Face
    Unconstitutionally Presumes Against New Competition
    for Reasons Unrelated to Public Health, Safety, and Welfare**

The licensing rule that requires an applicant to prove that "existing moving services are inadequate" presumes against anyone entering the moving trade.  This presumption protects incumbent firms against competition by entrepreneurs for reasons that are not connected in any way with the existing firms' quality, skills, reputation, cleanliness, or other public considerations.  The mere fact that a moving company *exists* is sufficient to prohibit a new firm from competing against it, at least

---

[13] The only partial exception was Margaret's Moving.  *See ante*, note 7.

until the new firm undergoes the expensive and slow hearing process and overcomes the presumption of "adequacy."   The privilege thereby given to established firms is not rationally related to a legitimate government interest. Instead, it is unconstitutionally "designed to favor economically certain constituents at the expense of others similarly situated."  *Merrifield*, 547 F.3d at 991.  Even if there were objective standards for determining "inadequacy," which there are not, Ex. 2 at 13:19-24, 16:18-24, 18:1-4, the Competitor's Veto would remain unconstitutional because the state may not bar entry into a profession for reasons that do not rationally relate to protecting the public against dangerous or dishonest movers, or other public harms.  *Craigmiles*, 312 F.3d at 224.

## E.  The "Inadequacy" Requirement Is Unconstitutional as Applied

The Division applies the "inadequacy" requirement to bar would-be moving companies from entering the business for reasons unrelated to public health, safety, or welfare.  Michael Ball was denied a Certificate in a written decision that found that his business was safe and qualified—"fit, willing, and able"—but concluded that existing moving services were not "inadequate."  Exhibits 18 and 19; Ex. 8 No. 16.

Cases in which the Division has *granted* Certificates demonstrate that the only criterion the Division uses to assess "inadequacy" is whether or not an existing firm has filed a Protest.  For example, the Division routinely concludes that the absence of a Protest "indicates that the existing carriers are not capable of meeting the public's need."  *See ante*, note 8.  The Division has found existing services adequate in every Protested case.  Ex. 18 at PLF1791; Ex. 23 at PLF1617; Ex. 12 at PLF1456.

The Division admits that it uses no objective factors to determine "adequacy." Ex. 2 at 13:19-24, 16:18-24, 18:1-4.  General Counsel Jesse Rowe, testifying on behalf of the Division as a whole, admitted that the Division does not use any objective factors in making the adequacy determination, and that the Division "has no independent standard or document or list of factors or statistics" on which it relies when assessing "adequacy."  Ex. 2 at 18:1-4.

Kentucky courts have never defined "inadequate," but have ruled out several potential objective standards.  For instance, the public's desire for better or more convenient service is not enough to prove inadequacy.  *Combs v. Johnson*, 331 S.W.2d 730, 733 (Ky. 1959).  Nor is "proof of some instances of unsatisfactory service."  *Id.* at 734.  In *Jones v. Webb Transfer Line, Inc.*, 328 S.W.2d 407 (Ky. 1959), the Court found that the testimony of five witnesses that existing shippers were unsatisfactory was still not sufficient, because they only represented "a few isolated instances of unsatisfactory service."  *Id.* at 411.  These cases demonstrate that the "inadequacy" prong of KRS § 281.630(1) protects existing firms against competition even where customers are dissatisfied with their service, and in spite of evidence of insufficiency.

Indeed, even if existing moving services are shown to be *currently* inadequate, an application can still be rejected on the grounds that the existing firms *might become* adequate.  *See Combs*, 331 S.W.2d at 733.  Since it is impossible to measure whether or not existing movers *could* become adequate, this only compounds the vagueness—and perpetuates the monopoly position of existing

firms.  For example, when the Division rejected Michael Ball's application for a new Certificate, it ruled that existing services were adequate even though the existing firms admitted that they were sometimes unable to handle all the moving business; the Division ruled that those firms "contact other moving companies to help them out as needed."  Ex. 18 at PLF1791.  It based this conclusion on testimony by one owner of an existing firm who testified that when her company was unable to meet the demand for moving services, "I have 2 brothers in the moving business.  So I would call one of their companies first."  Ex. 17 at PLF0557.  Thus even where existing services are in fact inadequate, the Division can still rule that they are "adequate" and refuse to issue a new Certificate.  The result is to perpetuate a cartel among families and insiders—and against applicants like Bruner—for reasons that are not related to an applicant's fitness, skills, or safety record.

## F.  The Competitor's Veto Is Not Rationally Related to Any Other Legitimate Government Interest

Although the above shows that the Competitor's Veto does not rationally relate to a legitimate government interest, only protects established firms against legitimate competition, and is unconstitutionally vague and indefinite, this Court must also consider whether any other realistic public interest is promoted by that procedure. *Ziss Bros. Constr. Co., Inc. v. City of Independence, Ohio*, 439 F. App'x 467, 476 (6th Cir. 2011).  It is not.

In *Stanley v. Pub. Utils. Comm'n*, 295 U.S. 76, 78 (1935) (per curiam), the Supreme Court upheld a law requiring moving businesses to obtain a Certificate

because that requirement preserved public roads from deterioration caused by too many moving vans operating.  But the Division does not consider the volume of vehicular traffic on state highways when reviewing an application for a Certificate. Ex. 8 No. 1; Ex. 7 No. 4; Ex. 2 at 17:4-18:17.  Protestants are not required to specify facts or opinions relating to preservation of roads to invoke the hearing requirement. KRS § 281.625(2); 601 Ky. Admin. Regs. 1:030(4)(1).  Nor have such considerations ever entered into the application process.  Ex. 8 No. 1.  Neither the statute nor the regulations make any mention of the condition of public roads, nor is there any case in the record in which the Division considered such factors.  This case more resembles *Buck*, 267 U.S. at 315-16, which found that the law did not operate

> with a view to safety or to conservation of the highways, but the prohibition of competition.  It determines not the manner of use, but the persons by whom the highways may be used.  It prohibits such use to some persons while permitting it to others for the same purpose and in the same manner.

Nor does the Competitor's Veto promote economic policies.  The Division does not consider employment rates in the moving industry when making its determinations.  Ex. 7 No. 6; Ex. 8 No. 3; Ex. 2 at 17:8-18.  No Protestant has provided the Division with information about monopolization in the industry, Ex. 8 No. 4, nor are Protestants required to provide facts or opinions relating to monopolization or other economic factors in order to invoke the hearing requirement. KRS § 271.625(2).  On the contrary, as Bruner's expert witness explains, the protectionist barrier established by the Competitor's Veto requirement *does* foster monopolistic conditions and prevent competition.  Moore Dec. ¶¶ 5-8, 11-12, 15-16,

- 29 -

18.  There is no empirical evidence of competition leading to inadequate services. *Id.* ¶¶ 16, 18.   Neither the statute nor the regulations makes reference to monopolistic conditions, nor is there any case in which an Protest resulted in any consideration of potential monopolization in the moving industry.  Protestants are not required to provide facts or opinions regarding environmental hazards, and there is no indication in the record that the Division has ever considered such matters.

As the Competitor's Veto deprives Bruner of his constitutionally protected liberty to pursue the occupation of his choice without a rational connection to public health, safety, or welfare, Bruner is entitled to summary judgment on his First Cause of Action.  Also, because the statutes in question grant an arbitrary and irrational preference to existing moving firms which is denied to Bruner, he is entitled to judgment on his Second Cause of Action.

## VI

### THE CRITERIA FOR OBTAINING CERTIFICATES ARE UNCONSTITUTIONALLY VAGUE

A licensing statute that vests officials with unbridled discretion whether to grant or withhold the license is unconstitutional.  *Yick Wo v. Hopkins*, 118 U.S. 356, 366-67 (1886); *White Oak Prop. Dev., LLC v. Washington Twp.*, 606 F.3d 842, 847-48 (6th Cir. 2010).   A licensing law is unconstitutionally vague where no statutory definitions or objective guidelines limit official discretion, so that citizens must guess at the law's meaning, and where the law "delegates basic policy matters to [officials] for resolution on an ad hoc and subjective basis."  *Id.* (quoting *Grayned*

*v. City of Rockford*, 408 U.S. 104, 109 (1972)). As shown below, the "inadequacy" and "present or future public convenience and necessity" standards in KRS § 281.630(1)—as well as the requirement in 601 Ky. Admin. Regs. 1:031(1) that the applicant prove "that there is a need for the service"—are vague and indefinite.

## A.  "Inadequate"

Certificate applicants bear the burden of proving that existing moving services are "inadequate."  But this word is not defined in any statute, regulation, or case law.[14]  Nor does the Division employ any handbook, manual, or other guideline defining the term.  Ex. 7 No. 18; Ex. 2 at 20:1-20; Ex. 9.  The Division admitted that there are no objective factors on which it bases its determination of "adequacy," Ex. 2 at 13:19-24, 16:18-24, 18:1-4.  It does not conduct independent assessments or investigations of the cost of moving services, employment in the industry, or other factors.  Ex. 7 No. 6; Ex. 8 No. 3; Ex. 2 at 18:8-18, 32:11-16; Ex. 1 at 31:5-18.  A person of ordinary intelligence "must necessarily guess" at the meaning of "inadequate," "and differ as to its application," *Columbia Natural Res., Inc. v. Tatum*, 58 F.3d 1101, 1105 (6th Cir. 1995) (citation omitted).  The "adequacy" requirement

---

[14] In *Eck Miller Transfer Co. v. Armes*, 269 S.W.2d 287, 289 (Ky. 1954), the Kentucky Court of Appeals defined "inadequacy" as "substantial inadequacy," and added that this "inadequacy" must be due to a deficiency that manifests "an inability or unwillingness to render adequate service."  Needless to say, this circular language—defining "inadequacy" as "inadequacy"—provides no meaningful definition.  *Cf. Madrid v. Gomez*, 889 F. Supp. 1146, 1182 (N.D. Cal. 1995) (definition of "force" was circular when it provided that "force refers to force which is force," and was thus a "vague standard [which] provides little, if any, guidance."). Likewise, *Combs*, 331 S.W.2d at 733, admitted that "[i]nadequacy and public need are relative terms," and then reiterated that *Armes*' circular definition without providing any standards or guidelines for determining "inadequacy."

does not give an applicant "a reasonable opportunity to know what is prohibited, so that he may act accordingly." *Philman's, Inc. v. City of W. Carrollton*, 577 F. Supp. 1380, 1387 (S.D. Ohio 1983).

In *North American Van Lines v. United States*, 243 F.2d 693 (6th Cir. 1957), the court ruled that a regulation of moving companies was unconstitutionally vague where the statute failed to define the term "household goods."  In that case, unlike here, the administrative agency had adopted regulations defining the term.  *See id.* at 697.  But the Court of Appeals found the regulation did not cure the statute's vagueness.  *Id.*  While "[i]mpossible standards of specificity are not required," a statute's language "must convey sufficiently definite warning as to the proscribed conduct when measured by common understanding and practices."  *Id.*  Here, the statute is much worse.  There are no regulations that define "inadequate," or "a need" and so forth—terms far less intrinsically clear than the language that was found inadequate in *North American Van Lines*.

In *Belle Maer Harbor v. Twp. of Harrison*, 170 F.3d 553, 557-58 (6th Cir. 1999), the Court of Appeals ruled that an ordinance regulating waterways was unconstitutionally vague because it failed to define the term "reasonable."  The ordinance's "definitional slipperiness," *id.* at 558, was not cured by resort to the dictionary; the dictionary definition of "reasonable" was "susceptible to a myriad of interpretations conferring on the inspectors virtually unrestrained power."  *Id.* at 558 (citation and quotation marks omitted).  Even the officials charged with enforcing the ordinance had acknowledged that they "could not discern an intelligible standard."

*Id.* Likewise, here, the term "adequate" has no legal definition, and the dictionary provides no intelligible standard.[15]  An applicant cannot know whether or not the Division will find existing moving companies to be "adequate," or what proof he or she should submit to demonstrate inadequacy, or what standard of review applies—except that Protested applications are invariably rejected on the basis of "adequacy."   And officials charged with enforcing the law admit there are no objective standards defining the term.  Ex. 2 at 13:19-24, 16:18-24, 18:1-4.

The record shows that one applicant, Larry Coyle, *did* try to prove "inadequacy" by offering testimony from an economist about the market in Berea, where Coyle wanted to operate.  Ex. 22 at PLF0433-53.  The witness testified to a dramatic increase in the county's population in the previous decade; that the county, which constituted a trade area of about 145,000 people, had only a single moving company to serve it.  Yet the hearing officer concluded that existing service was still "adequate" because "the mobility of the American population has gone down greatly," and the existing company "testified to a significant decline in demand," so that allowing a new company to compete would be "unfair and destructive" to existing firms.  Ex. 23 at PLF1617; Ex. 8 No. 15.

In *Philman's*, the District Court found an ordinance prohibiting businesses from selling "drug paraphernalia" unconstitutional.  577 F. Supp. at 1387-90.  The court found that there were no "definitional guidelines" to explain what "drug

---

[15] Adequate is defined as "1. Equal in size or scope . . . .  2. Equal to, proportionate to, or fully sufficient for a specified or implied requirement . . . narrowly or barely sufficient."  *Webster's Third International Dictionary* 25 (1993).

- 33 -

paraphernalia" was.  *Id.* at 1389.  The city tried to defend the ordinance by arguing that businesses had the burden of "seeking out exactly what type of behavior is proscribed," *id.*, but the court rejected that argument.  The ordinance's lack of definitions made it impossible to determine beforehand what conduct was and was not allowed.  Likewise, the Competitor's Veto requires applicants to prove "inadequacy," but provides no "definitional guidelines" that explain what evidence is required, what standards of proof apply, or what sorts of moving services are or are not "adequate."  Nor can an applicant be forced to figure out what the term means.

The Division appears to use only one definition of "adequacy":  if an existing moving company files a Protest, then existing services are adequate.  For example, when the Division denied Margaret's Moving a new Certificate, the hearing officer found existing services adequate because Margaret's had "failed . . . to demonstrate that the existing movers can not meet the public's demand," and had not proven "that moves made by [Margaret's] could not have been performed by one of the existing companies."  Ex. 12 at PLF1456.  When the Division later reversed itself and allowed Margaret's to buy a Certificate, the hearing officer said "[t]his application was not protested.  This . . . supports the conclusion that the existing carriers are not capable of meeting the public's need."  Ex. 121 at PLF1597.

In sum, "inadequate" has no definition, and there are no guidelines explaining to applicants what it means, or how to prove it.  The result is that the Division enforces the Competitor's Veto "on an ad hoc and subjective basis." *White Oak Prop. Dev.*, 606 F.3d at 847-48.

## B.  "Present or Future Public Convenience and Necessity"

Kentucky also has no statute, regulation, or other standard defining the term "present or future public convenience and necessity," KRS § 281.630(1), or explaining how the Division can predict what "future public convenience" might require.[16]  The Division does not provide instructions to applicants that explain what evidence proves "present" or "future" public convenience or what factors the Division considers when making such determinations.  Ex. 2 at 21:17-20.  The Division decides on an ad hoc basis "whether it makes sense to grant an additional carrier," but in making that determination "[w]e don't have any standards."  Ex. 2 at 16:7-24.

The phrase "public convenience and necessity" is not unusual in public utility regulation, but courts have never defined it.  The closest Kentucky courts have come was *Red Star Transp. Co. v. Red Dot Coach Lines*, 295 S.W. 419, 420 (Ky. 1927), which unhelpfully stated that the phrase is "relative . . . .  If additional service is a public necessity, relief from such necessity is a convenience.  Conversely, if reasonably adequate public conveniences exist, there is no necessity for relief."  The court did not try to explain what "*future* public convenience and necessity" means.

The phrase "present or future public convenience and necessity" does appear in the laws of some other jurisdictions, including the Interstate Commerce Act.  But federal courts have often remarked on its vagueness, and have upheld its

---

[16] By contrast, 807 Ky. Admin. Regs. 5:120 specifies explicit and objective standards for an applicant who seeks a "certificate of public convenience and necessity" to install an electric transmission line.  An applicant must submit detailed maps showing the locations of the proposed lines, prove that local property owners have been informed, describe the applicant's financial outlays, and so forth.

constitutionality *only* because federal regulations specify *objective factors* the agency must find, and standards parties must prove, in order to make valid findings. *See*, *e.g.*, *Ass'n of Am. R.R.s v. I.C.C.,* 846 F.2d 1465, 1467 (D.C. Cir. 1988) (describing "public convenience and necessity" as "vague," but noting that the ICC had promulgated regulations that guided its discretion.).  In *Burlington Truck Lines, Inc., v. I.C.C.*, 194 F. Supp. 31, 50 (S.D. Ill. 1961), *rev'd on other grounds,* 371 U.S. 156 (1962), the District Court recognized that "[f]uture need is an uncertainty in all instances," so that predicting "future" public convenience was a dangerously vague proposition, requiring officials to "exercise a prophetic vision."  But it ruled that the uncertainty was limited by regulations that established "evidentiary guidelines" specifying objective standards that applicants had to prove to the Commission.  *See also Artus Trucking Co., Inc. v. I.C.C.*, 377 F. Supp. 1224, 1230-31 (E.D.N.Y. 1974) (citing *John Novak Contract Carrier Application*, 103 M.C.C. 555, 557 (1967)).

No such guidelines exist in Kentucky regulations.  Kentucky regulations make no mention of the phrase "present or future public convenience and necessity"—and an applicant cannot know what evidence, what testimony, or what factors, the Division will consider relevant when determining the "future public convenience." The phrase is so vague that persons of ordinary intelligence must guess as to its meaning.  While *Combs*, 331 S.W.2d at 733, identified various "factors" and "considerations" to be weighed when evaluating "present or future public convenience and necessity," it did not specify the exact considerations, or say what weight is to be assigned to each factor, or whether they are conjunctive or disjunctive

or dispositive, or what sort of evidence or testimony is required to establish each factor.  As with "inadequacy," it appears that the only determinative factor is whether or not the applicant would compete against existing firms.

## C.  "A Need"

When no Protest is filed, and the Division chooses not to hold a hearing, the applicant must still "submit evidence by affidavit showing that there is a need for the service."  601 Ky. Admin. Regs. 1:031(1).  No statute or regulation defines "a need," or explains how to prove it,[17] and it is not clear whether "a need" is the same as "existing transportation service is inadequate."  This term, too, is unconstitutionally vague and allows the Division to determine "needs" on a subjective basis.

In short, decision-makers are given no meaningful guidance in evaluating a Protested application—they are only instructed to "consider" certain vague factors such as "a need."  This is not "discretion in the legal sense of that term, but . . . mere will.  It is purely arbitrary and acknowledges neither guidance nor restraint."  *Yick Wo*, 118 U.S. at 366-67.   The Competitor's Veto statute is therefore unconstitutionally void for vagueness, and Plaintiffs are entitled to summary judgment on their Third Cause of Action.

---

[17]  The Division typically requires applicants to submit affidavits from four witnesses to prove "a need," but there is no statute, regulation, caselaw, or other legal authority that requires four, instead of any other number.  Ex. 2 at 28:1-13.  The magic number "four" seems to have been invented by the Division without any authority.

## VII

## THE COMPETITOR'S VETO LAW VIOLATES
## THE PRIVILEGES OR IMMUNITIES CLAUSE

The Competitor's Veto also abridges Mr. Bruner's[18] privileges and immunities, in violation of the Fourteenth Amendment, which prohibits states from depriving a citizen of those rights which derive from federal citizenship. *See Slaughter-House Cases*, 83 U.S. (16 Wall.) 36, 75 (1873); *Saenz v. Roe*, 526 U.S. 489, 503 (1999).

The question with regard to Mr. Bruner's privileges or immunities claim is whether the right to earn a living free from irrational government interference appertains to federal citizenship, and is therefore protected against state interference. *In re Storer*, 58 F.3d 1125, 1127-28 (6th Cir. 1995). Courts have made clear that the right to engage in a profession without unreasonable government interference is a right of federal citizenship. *See*, *e.g.*, *Greene*, 360 U.S. at 492 ("the right to . . . follow a chosen profession free from unreasonable governmental interference comes within the 'liberty' and 'property' concepts of the Fifth Amendment"). *Accord, Schware*, 353 U.S. at 238-39; *New State Ice*, 285 U.S. at 278; *Wilkerson*, 699 F.2d at 328. These cases recognized that the right to pursue a lawful trade without unreasonable government interference is a right of federal citizenship, with which states may not arbitrarily interfere.

Although *Slaughter-House* weakened the applicability of the Privileges or

---

[18] Corporations are not covered by the Privileges or Immunities Clause, *Western Turf Ass'n v. Greenberg*, 204 U.S. 359, 363 (1907), so Wildcat Moving does not seek relief under this cause of action.

Immunities Clause, the *Saenz* Court indicated that the Clause continues to limit the power of states.  526 U.S. at 503-04.[19]  Therefore, while the Due Process and Equal Protection Clauses protect the right to earn a living from irrational government interference, the Privileges or Immunities Clause provides Mr. Bruner with a further basis for relief.  As explained in Parts V and VI, the Competitor's Veto law abridges his right to earn a living, with no meaningful connection to protecting the public health and safety.  It therefore violates the Privileges or Immunities Clause.  Plaintiffs are entitled to judgment on their Fourth Cause of Action.

## CONCLUSION

Plaintiffs respectfully move that this Court grant summary judgment for Plaintiffs on their First through Fourth Causes of Action; issue judgment declaring the Competitor's Veto procedure established by KRS § 281.630(1) and 601 Ky. Admin. Regs. 1:030, and the policies and practices whereby Defendants enforce

---

[19] In *McDonald v. Chicago*, 130 S. Ct. 3020 (2010), the Court found "no need" to address the question of whether or not to overrule *Slaughter-House* in its entirety. *Id.* at 3030.  Only the Supreme Court can overrule its own precedents, of course, but lower courts are free to recognize when part of an old decision is no longer valid law. *See, e.g., United States v. Newborn*, 71 F. App'x 557, 564 (6th Cir. 2003); *Dominion Nat'l Bank v. Olsen*, 771 F.2d 108, 118 (6th Cir. 1985).

these provisions, unconstitutional and unenforceable; and to permanently enjoin Defendants from enforcing the challenged statute and regulations.

DATED:  October 29, 2013.

Respectfully submitted,

TIMOTHY SANDEFUR
JOSHUA P. THOMPSON
Pacific Legal Foundation

KRISTOPHER D. COLLMAN
The Getty Law Group, PLLC


_____ s/ Timothy Sandefur _____
TIMOTHY SANDEFUR*

Pacific Legal Foundation
930 G Street
Sacramento, California 95814
Telephone:  (916) 419-7111
Facsimile:  (916) 419-7747
E-mail:  tsandefur@pacificlegal.org

KRISTOPHER D. COLLMAN
The Getty Law Group, PLLC
1900 Lexington Financial Center
250 West Main Street
Lexington, Kentucky 40507
Telephone:  (859) 259-1900
Facsimile:  (859) 259-1909
E-Mail:  kcollman@gettylawgroup.com

Attorneys for Plaintiffs

*pro hac vice

## CERTIFICATE OF SERVICE

I hereby certify that on October 29, 2013, I electronically filed the foregoing with the clerk of the court by using the CM/ECF system.


_____s/ Timothy Sandefur_____
TIMOTHY SANDEFUR*

Attorney for Plaintiffs

*pro hac vice